# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | JOAN B. GOTTSCHALL | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 03 C 1740 | DATE | DEC 2 2 2004 |
| CASE TITLE | William Joseph Buck (#R-21689) vs. Lake County Sheriff Del Rey, et al. | | |

MOTION: [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]    For the reasons set forth in the attached Memorandum Opinion and Order, the defendants' motion for summary judgment [#47] is granted.  The clerk is directed to enter judgment in favor of the defendants and against the plaintiff on all remaining claims pursuant to Fed. R. Civ. P. 56. The case is terminated.  The parties are to bear their own costs.

(11) ■ [See accompanying Memorandum Opinion and Order.]

| | | |
|---|---|---|
| No notices required, advised in open court. | | Document Number |
| No notices required. | number of notices | |
| Notices mailed by judge's staff. | DEC 2 3 2004 | |
| Notified counsel by telephone. | date docketed | |
| Docketing to mail notices. | | 64 |
| Mail AO 450 form. | docketing deputy initials | |
| Copy to judge/magistrate judge. | date mailed notice | |
| mjm | courtroom deputy's initials | date/time received in central Clerk's Office | mailing deputy initials |

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

WILLIAM J. BUCK (#R-21689),    )
    )
      Plaintiff,    )
    )
    )   No. 03 C 1740
    v.    )
    )   Judge Joan B. Gottschall
    )
LAKE COUNTY SHERIFF, et al.,    )
    )
      Defendants.    )

**DOCKETED**

DEC 2 3 2004

## MEMORANDUM OPINION AND ORDER

The plaintiff, currently a state prisoner, has brought this *pro se* civil rights action pursuant to 42 U.S.C. § 1983. The plaintiff claims that while he was in the pretrial custody of the Lake County Jail, the defendants, correctional officials, violated the plaintiff's constitutional rights by placing him in punitive segregation without due process, by infringing on the exercise of his religious beliefs, by acting with deliberate indifference to his serious medical needs, and by denying him equal protection. The plaintiff contends that the correctional staff mistreated him because he was charged with murdering a police officer. This matter is before the court for consideration of the defendants' motion for summary judgment. For the reasons stated in this order, the motion will be granted.

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Prime Northgate Plaza Ltd. Partnership v. Lifecare Acquisitions Corp.*, 985 F. Supp. 815, 817 (N.D. Ill. 1997). In determining whether factual issues exist, the court must view all the evidence and draw all reasonable inferences

in the light most favorable to the non-moving party. *Walker v. Northeast Regional Commuter Railroad Corp.*, 225 F.3d 895, 897 (7th Cir. 2000).

However, Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Chiaramonte v. Fashion Bed Group, Inc.*, 129 F.3d 391, 393 (7th Cir. 1997), *cert. denied*, 523 U.S. 1118 (1998).

## FACTS

The plaintiff, currently a state prisoner, was a pretrial detainee at all times relevant to this action. (Amended Complaint, p. 7.) The defendant Chuck DeFilippo is and was the Director of the Lake County Jail. (*Id.*, p. 2.) The defendants Cliff Metaxa, Patricia Quick (formerly Machak), and Roger Trutsch were all jail correctional officers at the time of the events giving rise to this action. (*Id.*, pp. 2-3.) [By Memorandum Opinion and Order of September 9, 2003, the court dismissed certain other claims and defendants.]

The following facts are undisputed for purposes of this motion (or there is no triable issue as to these facts):[1] On or about August 2, 2001, the plaintiff was arrested and charged with murdering a police officer in Winnebago County, Illinois. (Defendants' Exhibit C, Affidavit of Patrick Firman,

---

[1]

The court will assume that any statements of fact set forth by the defendants which the plaintiff simply characterizes as "not material" without specifically refuting them are uncontested. Furthermore, simple denials, without any evidence in the record such as deposition testimony or the plaintiff's affidavit as foundation are insufficient to defeat summary judgment. Unsupported statements in a brief are not evidence and cannot be given any weight. *See, e.g., In the Matter of Morris Paint and Varnish Co.*, 773 F.2d 130, 134 (7th Cir. 1985); *Myers v. McAuley*, No. 02 C 1590, 2003 WL 22232830, at *1 (Sep. 16, 2003) (Coar, J.).

Director of the Corrections Division of the Lake County Jail, ¶ 2; Defendants' Exhibit E, Affidavit of Winnebago County Sheriff Eddie Houi, ¶ 5.) Sheriff Houi classified the plaintiff as a "Level III" inmate, subject to the heaviest security restrictions. (Houi Affidavit, ¶ ¶ 4, 6.)

Due to the high profile nature of the case, the judge presiding over the criminal proceedings decided to select a jury from another county. (Houi Affidavit, ¶ 9.). The Winnebago County Sheriff therefore asked for, and received, permission for a temporary transfer of the plaintiff from the Winnebago County Jail to the Lake County Jail during jury selection. (Firman Affidavit, ¶ 2.) It was anticipated that the plaintiff would be confined in Lake County for one week. (*Id.*, ¶ 3.)

The Winnebago County Sheriff informed Lake County authorities that the plaintiff was a "high profile, high security" inmate. (*Id.*, ¶ 3.)[2] Lake County's Director of Corrections [Firman, who is not a defendant] therefore classified the plaintiff as a "Status 3, security risk" inmate prior to his arrival at the jail. (*Id.*, ¶ 4.) Firman directed that the plaintiff be housed in maximum security throughout his detention at the Lake County Jail, with the restrictions pertaining to level 3 inmates. (*Id.*, ¶ ¶ 6, 7.) Firman made his decision based on such factors as the serious nature of the charges, the media attention, the determination by the Winnebago County's Sheriff Office that the plaintiff was a security risk, and the fact that the plaintiff was being held only temporarily at the Lake County Jail. (*Id.*, ¶ 5.) Firman wanted to take "every precaution" to protect the plaintiff, other inmates, and staff; he also intended to prevent any type of "incident" from occurring while the plaintiff was in Lake County custody. (*Id.*)

---

[2]

Statements attributed to the Winnebago County Sheriff do not run into hearsay problems. The Winnebago County Sheriff has submitted his own affidavit that corroborates Firman's affidavit. In any case, those statements are not offered as evidence to prove the truth of the matters asserted; indeed it does not matter whether Houi's statements about the plaintiff's security status were true. Rather, Firman has testified that he relied on the information provided by Houi (accurate or not) in deciding whether to house the plaintiff in Lake County and, if so, what security measures were warranted.

Lake County Corrections Division Policy specifically requires maximum security procedures where "inmates need protection from other inmates due to history or charge," where they face charges "that may qualify for capital punishment," or when the detainee is "any notorious, highly publicized or newsworthy inmate." (Firman Affidavit, ¶ 9; *see also* attached Exhibit 3 to Firman Affidavit, "Lake County Sheriff Adult Correctional Division Post Order Classification," at p. 000249, ¶ 4.) The security procedures serve to avoid acts of violence toward other inmates, staff and the public, as well as to impede escape attempts. (Firman Affidavit, ¶ 18.)

On January 2, 2003, Firman issued a memorandum to the corrections command staff about security measures that were to be implemented with regard to the plaintiff. (Defendants' Exhibit C-2.) The named defendants played no role in the determination of the plaintiff's security classification, a decision arrived at prior to his arrival at the jail. (Defendants' Exhibit B, Affidavit of Chuck DeFilippo, ¶¶ 4, 5; Defendants' Exhibit F, Affidavit of Cliffton Metaxa, ¶ 4; Defendants' Exhibit H, Affidavit of Patricia (Machak) Quick, ¶ 5; Defendants' Exhibit J, Affidavit of Roger Trutsch, ¶ 5.)

Inmates in the general population at the Lake County Jail are able to move freely in their "pod" and to socialize with each other and with correctional officers. (*Id.*, ¶ 12.) Inmates in maximum security are held in individual, locked cells. (*Id.*) Bars prevented the plaintiff from having physical contact with correctional officers and fellow inmates. (Firman Affidavit, ¶ 12.) Lake County Corrections Division Policy requires that Status 3 inmates must be cuffed and shackled and accompanied by two officers when they are out of their cell. (Exhibit 3 to Firman Affidavit.)

Lieutenant Rick Hamm, a Lake County correctional officer who was present when the plaintiff was booked at the Lake County Jail, noted that the plaintiff arrived at the jail accompanied by four sheriff's officers in two squad cars. (Defendants' Exhibit D, Hamm Affidavit, ¶ 4.) Based on Hamm's lengthy experience, the use of a second, "chase" vehicle was highly unusual, Hamm having

witnessed such a transfer only three times in "hundreds" of inmate transfers. (*Id.*) To Hamm, the process confirmed that the plaintiff was regarded as a high security risk. (*Id.*) [Hamm additionally states that he advised the plaintiff during the booking process that he was being classified as a high security inmate and that the plaintiff did not express any disagreement. (Hamm Affidavit at ¶ ¶ 5, 6.) However, the plaintiff denies ever being apprised of his maximum security status.]

The plaintiff ended up remaining longer than expected at the Lake County Jail; he was held there from January 3, 2003, until February 13, 2003 (that is, for forty-two days, instead of a week). (Amended Complaint, ¶ 8.) Every day, corrections staff contacted the courtroom deputy to ascertain the status of jury selection. (Firman Affidavit, ¶ 10.) The plaintiff's detention in Lake County was treated on a day-to-day basis, as Firman expected that jury selection would be completed at any time and the plaintiff would be transferred back to Winnebago County custody. (*Id.*, ¶ 10.)

Throughout his confinement at the Lake County Jail, the plaintiff was housed in the second floor of the jail's maximum security area, known as "3 North Pod." (Metaxa Affidavit, ¶ ¶ 4, 7; Firman Affidavit, ¶ 8.) Every week, Lake County Jail authorities held classification meetings to discuss inmates' security levels. (Id., ¶ 11.) No change in circumstances occurred during the plaintiff's detention at the Lake County Jail to affect his classification. (Firman Affidavit, ¶ 11.)

The plaintiff faced the same restrictions as those imposed upon any other maximum security, status 3 inmates. (Firman Affidavit, ¶ 14.) He and all other inmates in the maximum security pod were subject to the following restrictions: no group activity or commingling among inmates; no involvement in any group program activities, including GED classes or religious services; 23-hour lockdown, with one hour free time alone in the dayroom; access to telephone, newspapers and exercise while in the dayroom. (*Id.*) Inmates in maximum security, including the plaintiff, could receive visitors, use the telephone, read the newspaper, have access to the library upon request, and

exercise during their one hour out of the cell each day. (*Id.*) The plaintiff was out of his cell most days attending court from seven or eight o'clock in the morning to five or six in the evening. (Plaintiff's Deposition, p. 83.)

On January 26, 2003, at approximately 4:10 p.m., Sergeant Richard Clouse (not a defendant) was summoned to the 3 North Pod to respond to a complaint of a disruptive inmate, Darnell Harris, who was housed in that unit. (Defendants' Exhibit A, Affidavit of Richard Clouse, ¶ 4.) Clouse ultimately resorted to releasing a single spray of oleoresin capsicum (OC) spray in Harris' face in order to subdue him. (*Id.*, ¶ 5.) Correctional staff and health care providers documented the incident and provided follow-up care for Harris. (Millas Affidavit, ¶ 8; Clouse Affidavit, ¶ 5; Trutsch Affidavit, ¶ 6.) The only medical attention Harris needed was to have his eyes washed with a saline solution. (*Id.*)

About ten or fifteen minutes after the incident, the plaintiff, who was housed on a different floor but directly above Harris, began shouting and kicking on his cell door, complaining that he had a burning sensation in his nose and was experiencing difficulty breathing due to the OC spray. (Trutsch Affidavit, ¶ 8.) Although the parties dispute whether the plaintiff exhibited any signs of a reaction to the OC spray or how Trutsch dealt with the situation, the parties agree that Trutsch went to the plaintiff's cell and declined to summon a member of the health care staff after talking to the plaintiff.

The defendant Quick (sued as Machak) denies that she ever had any conversations with the plaintiff following the OC spray incident; she additionally denies that the plaintiff ever expressed any medical problem or adverse reaction to OC spray to her. (Quick Affidavit, ¶ 8.)

The defendant Metaxa claims that he was not working on January 26, 2003, was not present at the jail that day, and therefore did not see or have any interaction or conversation with the plaintiff

6

on that date. (Quick Affidavit, ¶ 8; Metaxa Affidavit, ¶ 6.) Metaxa therefore denies threatening the plaintiff with mace that day--or at any other time during the plaintiff's incarceration at the jail. (Metaxa Affidavit, ¶ 7; Exhibit A to Metaxa Affidavit, Log Book for January 26, 2003.)

A nurse dispensed Prednisone (a medication to facilitate breathing and prevent asthma attacks) and Trazadone (an anti-anxiety drug) to the plaintiff every day unless he refused them. (Defendants' Exhibit G, Affidavit of Nurse Janice Millas, ¶ 5.) At 8:35 p.m. on January 26, 2003, (about four hours after the OC incident), the nurse on duty at the jail arrived at the 3 North Pod to administer daily medications to the inmates housed there. (Sheline Affidavit, ¶ 8.) The plaintiff admits that he was no longer suffering any symptoms by the time Millas went to his cell. (Plaintiff's Deposition, p. 80.) The plaintiff claims that he did mention to Nurse Millas that he had experienced an asthma attack earlier, but Millas does not recall the plaintiff complaining of or exhibiting any physical manifestations of an asthma attack or other physical distress that day. (Millas Affidavit, ¶ 6.) Millas additionally certifies that the Lake County Jail Medication Administration Record contains no note by her or any other nurse that the plaintiff was in "physical distress." (*Id.*, ¶ 7.) Millas asserts that medical protocol would have required her to document the matter during her daily rounds and to seek immediate follow-up medical attention had there been any indication of a medical problem. (*Id.*)

Lake County Sheriff's Office policy requires a security check every thirty minutes. (Trutsch Affidavit, ¶ 9.) Two correctional officers make a visual check of every inmate housed in a given pod as part of the security check. (*Id.*) A log book for each pod documents each security check and notes any abnormal activities. (*Id.*, ¶¶ 9 and 10; *see also* Exhibit A to Affidavit, excerpt from log book.) The log book record during the period of the plaintiff's incarceration makes no mention of physical distress or a request for medical attention on the part of the plaintiff on the date of his purported asthma attack. (*Id.*)

7

Group religious services are held in the jail's law library once a week. (Firman Affidavit, ¶ 15.) Maximum security inmates are not allowed to attend group services with general population inmates because jail rules require two correctional officers to transport and remain with any maximum security inmate when he is outside of his cell; there is not enough staff at the jail to meet that kind of a demand. (*Id.*) Group services are not held in the individual pods because, since inmates are locked in their cells, some detainees could otherwise be unwillingly subjected to listening to religious homilies that might not be compatible with their beliefs. (*Id.*) Throughout his confinement at the Lake County Jail, the plaintiff was free to pray in his cell. (Plaintiff's Deposition, p. 53).

## DISCUSSION

Although the counts discussed below survived a motion to dismiss the amended complaint for failure to state a claim, the more fully developed record establishes that the defendants are entitled to judgment as a matter of law. Even viewing the record in the light most favorable to the plaintiff, no reasonable person could find that the defendants placed the plaintiff in punitive segregation without due process, acted with deliberate indifference to an objectively serious medical need, infringed on his First Amendment religious beliefs, or discriminated against him because he was accused of murdering a police officer.

### Count 1: Placement in "Isolation/Segregation" without Due Process

The plaintiff first claims that he was placed in the maximum security disciplinary unit upon arrival at the jail and remained in "isolation/segregation" throughout his confinement there, "locked down" in his cell more than twenty-three hours a day. The plaintiff contends that he was effectively subjected to disciplinary segregation although he had not violated any jail rules, did not receive a disciplinary report, and was not afforded a hearing. Although the defendants admit that the plaintiff

8

was confined to his cell twenty-three hours a day when not in court, the court finds as a matter of law that the lockdown did not amount to pretrial "punishment."

In order to state a conditions-of-confinement claim of constitutional significance, the challenged condition must amount to "punishment." *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). The standard for determining punishment is similar whether considered in the context of the Due Process Clause or the Eighth Amendment. *Zentmeyer v. Kendall County, Ill.*, 220 F.3d 805, 810 (7th Cir. 2000). Punishment requires something more than routine discomfort. *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981). Punishment in the constitutional sense requires allegations of extreme deprivations over an extended period of time. *Hudson v. McMillian*, 503 U.S. 1, 8-9 (1992); *Bell* at 542; *Henderson v. Sheahan*, 196 F.3d 839, 845 (7th Cir. 1999), *cert. denied*, 530 U.S. 1244 (2000).

The record establishes that the plaintiff was not placed in disciplinary segregation; rather, he was held in maximum security confinement. Furthermore, the Director of the Lake County Corrections Division, and not the named defendants, made the decision to hold the plaintiff in high security, with all the maximum security constraints associated with that classification.

It is uncontested that the plaintiff was classified as a "Level III" inmate at the Winnebago County Jail, subject to the heaviest restrictions. There is likewise no genuine dispute that the Winnebago County Sheriff reported to Lake County authorities that the plaintiff was a "high profile, high security" detainee. The Director of the Lake County Department of Corrections therefore classified the plaintiff as a "Status 3, security risk" inmate prior to his arrival at Lake County.[3] Two memoranda from Firman to corrections staff, one undated and one dated January 2, 2003, dictated

---

[3] .

    The plaintiff cannot challenge what Winnebago authorities relayed to Lake County authorities. Whether or not the information was correct, only Firman has the personal knowledge to testify what he was told. The plaintiff does not have the personal knowledge necessary to refute Firman's affidavit. *See* Fed. R. Civ. P. 56(e); *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 504 (7th Cir. 2004).

that the plaintiff be treated as a maximum security inmate when he arrived at Lake County. Firman made his decision based on such factors as the serious nature of the charges, the media attention, the previous determination by the Winnebago County's Sheriff Office that the plaintiff was a high security risk, and the fact that the plaintiff was being held only temporarily at the Lake County Jail.

Although the conditions for maximum security inmates are the same as or similar to those for inmates housed in disciplinary segregation, the plaintiff was placed in the maximum security unit as a security measure, and not for punitive reasons. No due process is required if the inmate is placed in segregation "not as punishment but for managerial reasons." *Higgs v. Carver*, 286 F.3d 437, 438 (7th Cir. 2002); *Bell v. Wolfish*, 441 U.S. 520, 538-39 (1979). The plaintiff's placement in administrative, non-punitive segregation as a "preventive rather than a punitive" measure did not require notice or a hearing and did not violate the plaintiff's constitutional rights.

It is irrelevant whether Officer Hamm informed the plaintiff upon his arrival that he was being classified as a high security inmate (which the plaintiff contests), or whether the plaintiff was given an interview or a hearing prior to his placement in maximum security. The court may grant summary judgment if facts are in dispute, so long as those facts are not outcome determinative. *Matter of Wildman*, 859 F.2d 553, 556 (7th Cir. 1988); *Nash v. DeTella*, No. 00 C 2784, 2001 WL 1160840, *2 n. 5 (N.D. Ill. Oct. 2, 2001) (Zagel, J.) Moreover, any non-conformance with the Lake County Jail handbook is not actionable under 42 U.S.C. § 1983. Violations of state law are not, in and of themselves, actionable as constitutional torts. *See, for example, Rowe v. DeBruyn*, 17 F.3d 1047, 1051 (7th Cir. 1994), *cert. denied*, 513 U.S. 1994 (1994).

The relatively short duration of the plaintiff's stay at the Lake County Jail further weakens his claim. The plaintiff remained at the Lake County Jail for forty-two days during the jury selection process; indeed, it was originally anticipated that he would be there only for one week. *Contrast*

*Antonelli v. Sheahan*, 81 F.3d 1422, 1431 (7th Cir. 1996) (sixteen months of pest infestation is a "prolonged deprivation") *with Smith v. Copeland*, 87 F.3d 265, 269 (8th Cir. 1996): "conditions such as a filthy cell that may be tolerable for a few days are intolerably cruel for weeks or months.") And although the plaintiff was subject to isolation and stringent security restrictions, there is no allegation that he was denied any basic necessities or exposed to inhumane conditions. *Compare Harris v. Fleming*, 839 F.2d 1232, 1235 (7th Cir. 1988) ("inmates cannot expect the amenities, conveniences and services of a good hotel"), with *Jackson v. Duckworth*, 955 F.2d 21, 22 (7th Cir. 1992) (objective component met where prison conditions were "strikingly reminiscent of the Black Hole of Calcutta").

The plaintiff's argument that maximum security placement was unnecessary is a non-issue. It is not the function of the court to second-guess the security determinations of Lake County authorities. "Prison officials must be accorded wide-ranging deference in matters of internal order and security." *Whitman v. Nesic*, 368 F.3d 931, 934-35 (7th Cir. 2004) (citations omitted). It is sufficient that the defendants have articulated rightful, non-disciplinary grounds for the plaintiff's classification. In fact, the court notes that the plaintiff's high security treatment persisted throughout the criminal proceedings: the trial court took the unusual step of stationing two corrections officers next to the plaintiff at all times in the courtroom. (Corina Curry, "The State v. William Buck," *Rockford Register Star*, Feb. 20, 2003, at 8A.[4])

---

[4]

    The court takes judicial notice of the above-referenced newspaper article as one additional piece of evidence relating to security concerns surrounding the plaintiff. The Seventh Circuit Court of Appeals has stated that courts may take judicial notice of matters in the public record on a motion to dismiss. *Palay v. United States*, 349 F.3d 418, 425 n. 5 (7th Cir. 2003) (citations omitted); *but see In re Motorola Securities Litigation*, No. 03 C 0287, 2004 WL 2032769, at *23, n.42 (N.D. Ill. Sep 09, 2004) ("This court could find no cases in which our Court of Appeals has addressed whether newspaper articles are matters of public record. . . .")

11

In short, the plaintiff has not described conditions so objectively below standards of human dignity as to implicate constitutional concern. The plaintiff's classification as a maximum security inmate, with its concomitant restrictions, did not violate the plaintiff's Fourteenth Amendment rights. The defendants have articulated legitimate administrative and penological reasons for placing the plaintiff in maximum security; furthermore, the plaintiff's classification, along with the attendant security restrictions, was reasonably related to those goals. Summary judgment is accordingly granted in favor of the defendants on the plaintiff's claim that he was placed in what he believes amounted to disciplinary segregation without due process.

## Count 2: Plaintiff's Inability to Participate in Religious Services

In Count 2, the plaintiff claims that, despite repeated requests, he was denied permission to attend group religious services. That restriction, however, did not rise to the level of a constitutional violation.

Correctional administrators must permit inmates a reasonable opportunity to exercise their religious freedom. *See, e.g., Tarpley v. Allen County, Indiana*, 312 F.3d 895, 898 (7th Cir. 2002), *citing Cruz v. Beto*, 405 U.S. 319, 322 n. 2 (1972). "[A] prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Brookins v. Kolb*, 990 F.2d 308, 312 (7th Cir. 1993); *Pell v. Procunier*, 417 U.S. 817, 822 (1974). When a challenged prison regulation impinges on an inmate's constitutional rights, the regulation is valid only if it is "reasonably related" to legitimate penological interests. *Turner v. Safley*, 482 U.S. 78, 89 (1987); *Russell v. Richards*, 384 F.3d 444, 447 (7th Cir. 2004).

Based on the four factors set forth in *Turner*, 482 U.S. at 89-90, the court finds that the defendants are entitled to judgment as a matter of law on this issue: (1) There was a valid and rational

12

connection between the regulation and a legitimate government interest behind the rule: Group activities among high security inmates greatly increase the likelihood of violence, joint action, and escape attempts. (2) The plaintiff had an alternative means of exercising his rights: he was free at the very least to pray alone in his cell. (3) Accommodating the plaintiff's desire to participate in group religious services would have had a significant adverse impact on jail administration: Permitting high security inmates to participate in group services would have seriously strained jail resources given that under jail policy, maximum security inmates must be escorted at all times by two officers when outside their cells. (4) There was no practical alternative, such as having a minister address the maximum security pod as a whole. Were the jail to do so, it risked infringing the rights of inmates who had no interest in being subjected to the religious rhetoric of any particular denomination.

"The law is clear that there is no absolute right to being able to attend group religious services; legitimate penological interests can take precedence over such a right." *Waldron v. Lesza*, No. 89 C 5101, 1992 WL 51676, at *3 (N.D. Ill. Mar. 10, 1992) (Hart, J.) (denial of group religious services for pretrial detainee in capital case did not violate his constitutional rights), *citing O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987) (work schedule and security for certain classification of inmates prevented attendance at Friday night services); *Hadi v. Horn*, 830 F.2d 779 (7th Cir. 1987) (prison administrators cancelled Muslim services when Muslim chaplain was unavailable to lead them; administrators could forbid inmates from leading the services).

The court additionally finds that the short-term denial of group religious services was too brief a period to implicate constitutional concerns. The plaintiff would have missed, at most, only six weekly church services during his forty-two days of confinement at the Lake County Jail. The "occasional or sporadic" failure to accommodate an inmate's religious needs does not violate the

13

Constitution. *Hadi, supra*, 830 F.2d at 788; *Threzzy v. O'Leary*, No. 89 C 3647, 1991 WL 4436, at *5 (N.D. Ill. Jan. 16, 1991) (Lindberg, J.) (failing to accommodate the religious requests of an inmate who was held in segregation "for his own safety and for administrative convenience in controlling temporary writ status inmates," did not offend the Constitution). Under the circumstances of this case, the *de minimis* burden on the plaintiff's free exercise caused by non-participation in group religious services for forty-two days is not actionable under 42 U.S.C. § 1983. *See also Rapier v. Harris*, 172 F.3d 999, 1006, n.4 (7th Cir. 1999): "*De minimis* burdens on the free exercise of religion are not of constitutional dimension."

The plaintiff may not, in response to the defendants' motion for summary judgment, add new claims about being denied a Bible or permission to see a chaplain. Aside from the fact that the defendants deny the plaintiff's new allegations, "a plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment." *Grayson v. O'Neill*, 308 F.3d 808, 817 (7th Cir. 2002). The plaintiff's additional claims are vague as well as untimely; it would be unfair to the defendants to add new claims at this late stage of the lawsuit, which was initiated in March 2003 and in which discovery closed last March. Furthermore, the plaintiff's new allegations about being denied a Bible or permission to see a chaplain conflict with his deposition testimony, where he admitted that he had never asked for a Bible. (*See* Plaintiff's Deposition, p. 54.) A party may not create an issue of fact by submitting an affidavit that contradicts prior sworn testimony. *Patterson v. Chicago Assoc. for Retarded Citizens*, 150 F.3d 719, 724 (7th Cir. 1998).

As discussed above, the defendants have articulated a valid justification for the plaintiff's segregation status; that security status ruled out any group activities. Furthermore, it must be emphasized that correctional officials anticipated that the plaintiff would be housed at the Lake County Jail for only for a week (although his confinement there turned out to last six weeks). In light

14

of the deferential standard accorded to the informed discretion of correctional officials, especially given the plaintiff's relatively short stay at the Lake County Jail, the court finds that the defendants are entitled to judgment as a matter of law on this claim. The defendants did not abridge the plaintiff's First Amendment rights.

## Count 3: Denial of Medical Attention

In Count 3, the plaintiff contends that the defendants Trutsch and Metaxa acted with deliberate indifference when the plaintiff suffered an asthmatic reaction to oleoresin capsicum (OC) spray. The record casts considerable doubt on whether the plaintiff had any medical issue whatsoever; regardless, even assuming both that he did suffer a severe reaction to the OC spray and that the defendants refused him access to medical care, the matter did not rise to the level of a Fourteenth Amendment violation.

It is well established that the Due Process Clause prohibits deliberate indifference to the serious medical needs of a pretrial detainee. *Qian v. Kautz*, 168 F.3d 949, 955 (7th Cir. 1999); *Salazar v. City of Chicago*, 940 F.2d 233, 237-38 (7th Cir. 1991). Deliberate indifference has both an objective and a subjective element: the inmate must have an objectively serious medical condition, and the health care provider must be subjectively aware of and consciously disregard a risk to the inmate's medical need. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976); *Sherrod v. Lingle*, 223 F.3d 605, 610 (7th Cir. 2000).

Inattention only to **serious** injury or signs of serious injury amounts to a constitutional violation. *Brownell v. Figel*, 950 F.2d 1285, 1289-92 (7th Cir. 1991). Under the Seventh Circuit's standard,

> A "serious" medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. . . . [Indications of a serious medical need include] the existence of an injury that a reasonable doctor or patient would find important and

worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain.

*See Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997). Asthma, depending on its degree, may constitute a serious medical condition, *see Garvin v. Armstrong*, 236 F.3d 896, 898 (7th Cir. 2001), and ignoring an actual asthma attack may well rise to the level of deliberate indifference. However, based on the evidence in the record in this case, no reasonable person could find that the plaintiff had an objectively serious medical need.

The evidence before the court makes it seem highly unlikely that the plaintiff suffered an OC-triggered asthma attack at all, let alone a serious episode. It strains credulity to believe that the plaintiff had such a severe reaction from a single burst of OC spray, particularly since the incident happened on another floor of the jail. Furthermore, in performing their routine rounds every half hour, neither Trutsch nor Officer Sheline (not a defendant) noticed that the plaintiff was experiencing problems. (Trutsch Affidavit, ¶¶ 9 and 10; Defendants' Exhibit I, Affidavit of Daniel Sheline, ¶¶ 6 and 7, as well as log book records attached thereto.) Health care staffers in the unit similarly made no note that the plaintiff was exhibiting signs of injury or physical distress. There is no evidence that the plaintiff filled out a medical request slip. The log books and the plaintiff's medical records make no mention of an asthma attack or other medical problem on that day. The plaintiff was able to kick his cell bars and shout for an officer apparently without difficulty, belying any inference of incapacitation.[5]

---

[5]

The plaintiff's insistence that the defendant Metaxa was one of the two officers who threatened to mace him if he persisted in asking for medical attention further undermines his claim. Metaxa has submitted an affidavit and work records showing that he was not working on January 26, 2003, and was not present at the jail that day; his statements are also supported by the affidavit of the
(continued...)

Nevertheless, the court will assume for purposes of this motion both that the plaintiff suffered an asthma attack and that the defendants denied his requests for medical attention, threatening to "mace" him if he persisted in complaining. In ruling on a motion for summary judgment, the court cannot weigh the affidavits or the credibility of the parties. *Castillo v. United States*, 34 F.3d 443, 445 (7th Cir. 1994). The court will therefore accept as true the plaintiff's account that he was having problems breathing and felt light-headed, and that he was sneezing, coughing, tearing and vomiting when the officers reached his cell. *See* Plaintiff's Deposition at pp. 73, 75.

But even if the events happened exactly as the plaintiff describes, the court finds that any attack was not of the severity contemplated by *Estelle* and its progeny. The plaintiff has acknowledged that the episode lasted "a few hours, a couple of hours" at most and that he was no longer suffering by the time the nurse made her rounds later that night. (Plaintiff's Deposition, p. 80.) The undisputed facts in this case (the relatively short time span of the attack, the fact that the plaintiff was seen later by a nurse notwithstanding any inaction on the part of the defendants, and the absence of any lingering problems or disabilities caused by the attack) defeat the plaintiff's claim that he had a medical need serious enough to implicate constitutional concerns.

In *Henderson v. Sheahan*, 196 F.3d 839 (7th Cir. 1999), an asthmatic inmate sued over his exposure to second-hand smoke while he was a pretrial detainee. The Court of Appeals for this circuit affirmed the dismissal of the complaint for failure to state a claim on the basis that the plaintiff's injuries were not so objectively serious as to implicate the Constitution.

---

[5](...continued)
defendant Machak-Quick. Metaxa could not have denied the plaintiff needed medical care when he was not on duty that day.

17

Nor do we believe that a layperson would consider the injuries alleged in Henderson's complaint to be so "serious" as to require a physician's care and attention. Instead, the injuries of which Henderson complains--breathing problems, chest pains, dizziness, sinus problems, headaches and a loss of energy--are, objectively speaking, relatively minor. *See Oliver* [*v. Deen*, 77 F.3d 156, 160-61 (7th Cir. 1996)]. While we do not doubt that these ailments caused him some distress and discomfort, they are not the sort of objectively serious injury or medical need that amounts to a denial of "the minimal civilized measure of life's necessities," *Farmer* [*v. Brennan*, 511 U.S. 825, 834 (1994)], necessary to state a violation of the Fourteenth Amendment. In fact, we have already determined that these sorts of injuries are not sufficiently serious to be constitutionally actionable. *See Oliver*, 77 F.3d at 58-61 (concluding at the summary judgment stage that an asthmatic prisoner failed to demonstrate that he had a serious medical need for a non-smoking environment even though his exposure to second-hand smoke aggravated his asthmatic condition causing him to suffer chest pains, difficulty in breathing, dizziness, nausea and other signs of discomfort).

*Henderson*, 196 F.3d at 846. Thus, while the court in no way condones ignoring an inmate's asthma attack, the court finds that under the circumstances of this case, no reasonable person could conclude that the defendants acted with deliberate indifference to a serious medical need. Although the court previously denied a motion to dismiss this count for failure to state an actionable federal claim, the more fully developed record establishes the defendants' entitlement to judgment as a matter of law.

In sum, there is no triable issue as to whether the defendants acted with deliberate indifference to an objectively serious medical need (or signs of a serious medical need). The plaintiff's alleged serious reaction to a single burst of OC spray on another floor is suspect; in any event, no correctional staff or health care staff who observed the plaintiff throughout that day and evening noted any outward signs of a physical problem. Neither medical records nor contemporaneous records kept in the regular course of business by defendants and non-defendants alike reflect any observation of physical distress, or any significant complaints by the plaintiff. In addition, the plaintiff himself has admitted that the problem abated on its own within hours. Consequently, the defendants' failure to perceive that a serious medical condition existed and to summon medical help, while no cause for commendation, did not amount to deliberate indifference to a serious medical need. The plaintiff

suffered no medical problem of such intensity or duration as to rise to the level of constitutional concern. Accordingly, summary judgment is granted in favor of the defendants on the plaintiff's medical claim.

### Count 4: Equal Protection

The court has construed Count #4 (the plaintiff's "retaliation" claim) as alleging an equal protection violation. *See* Memorandum Opinion and Order entered September 9, 2003. In denying the defendants' motion to dismiss, the court noted that the amended complaint did not make clear whether all maximum security inmates were treated the same, or whether the plaintiff was singled out for special restrictions due to the nature of his offense. However, the more fully developed record establishes that the plaintiff was subjected to the same restrictions as any "status 3" inmate would have been.

Each of the defendants has denied expressing any animus toward the plaintiff at any time during his incarceration at the Lake County Jail. (DeFilippo Affidavit, ¶ 11; Metaxa Affidavit, ¶ 7; Quick Affidavit, ¶ ¶ 9, 10, 12; Trutsch Affidavit, ¶ ¶ 8, 12.) The plaintiff maintains that the defendants are lying, insisting that they made remarks along the lines of his not having anything coming due to the nature of the charges against him and because he had "messed with one of their kind." (Plaintiff's Affidavit, ¶ 5.) But the factual dispute does not preclude summary judgment. Though each of the defendants has submitted an affidavit denying that he or she ever made hostile remarks to the plaintiff or mistreated him because he was accused of the homicide of a police officer, the court will assume for purposes of this motion that such remarks were made.

Nevertheless, verbal harassment, while inexcusable and unprofessional, does not rise to the level of a constitutional violation. *Patton v. Przybylski*, 822 F.2d 697, 700 (7th Cir. 1987) (citations omitted); *Oltarzewski v. Ruggiero*, 830 F.2d 136, 139 (9th Cir. 1987). Irrespective of any such

19

utterances by the defendants, the plaintiff endured the same restrictions as any other "status 3" inmate. As discussed *supra* in the context of the plaintiff's due process claim, that classification was made by the defendants' supervisor, the county corrections director, prior to the plaintiff's arrival at the jail.

Furthermore, contrary to the plaintiff's representations, he was not singled out for restrictive treatment. The plaintiff's own Exhibit 3 reflects that he was not the only "status 3" inmate in maximum security while he was at the Lake County Jail. The Classification Committee Meeting Status Roster lists at least three other Status III inmates (Scott Mitcheff, Justin Gordon, and Zsolt Keszleri) during the relevant time period. And a review of the Illinois Department of Corrections' website does not suggest that the other status three inmates were accused of murdering a police officer. Mitcheff was convicted of escape from a penal institution and burglary; Gordon was convicted of murder and other lesser offenses. (Keszleri is not in IDOC custody.) Admittedly, the high profile nature of the criminal case, including the fact that the plaintiff was accused of murdering a police officer, was one factor in the determination to treat the plaintiff as a high risk/high security detainee. But the nature of the offense implicated genuine security concerns and the decision was based on legitimate, non-punitive considerations. Consequently, for the same reasons that the plaintiff has no due process claim with respect to his non-punitive, administrative classification as a status 3 prisoner, he has no viable equal protection claim, even assuming (without finding) that he was the only detainee at the time who was held in "maximum segregation."

## CONCLUSION

For the reasons discussed above, the defendants' motion for summary judgment (docket #47) is granted. No material facts are in dispute and the court finds that the defendants are entitled to judgment as a matter of law on all remaining claims. The clerk is accordingly directed to enter

20

judgment in favor of the defendants and against the plaintiff on all remaining claims pursuant to Fed. R. Civ. P. 56.

If the plaintiff wishes to appeal this entry of final judgment, he may file a notice of appeal with this court within thirty days of the entry of judgment. Fed. R. App. P. 4(a)(4). A motion for leave to appeal *in forma pauperis* should set forth the issues the plaintiff plans to present on appeal. *See* Fed. R. App. P. 24(a)(1)(C). If the plaintiff does choose to appeal, he will be liable for the $255 appellate filing fee irrespective of the outcome of the appeal. *Lucien v. Jockisch*, 133 F.3d 464, 467 (7th Cir. 1998). Furthermore, if the appeal is found to be non-meritorious, the plaintiff may be assessed a "strike" pursuant to 28 U.S.C. § 1915(g). Under that statute, if a prisoner has had a total of three federal cases or appeals dismissed as frivolous, malicious, or failing to state a claim, he may not file suit in federal court without prepaying the filing fee unless he is in imminent danger of serious physical injury. *Id.*

ENTER: *Dec. 20, 2004*

Joan B. Gottschall
United States District Judge

21